EVAN A. JENNESS (No. 136822)
2115 Main Street
Santa Monica, CA 90405
Telephone: (310) 399-3259
Facsimile: (310) 392-9029
Evan@jennesslaw.com

Attorney for Defendant
LAWRENCE CORBI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>       v.<br><br>LAWRENCE CORBI,<br><br>            Defendant.<br>_____ | CASE NO. CR 10-1099-DSF<br><br>DEFENSE POSITION REGARDING SENTENCING, AND OBJECTIONS TO PRESENTENCE REPORT; EXHIBITS<br><br>Date:  May 23, 2011 (8:30 a.m.)<br>Place: 840-Roybal |

       Larry Corbi, through counsel, hereby submits the accompanying memorandum and exhibits regarding sentencing, and objections to the Presentence Report.

Dated: May 2, 2011

                              Respectfully submitted,

                              LAW OFFICES OF EVAN A. JENNESS

                                   /ss/

                              _____
                              EVAN A. JENNESS
                              Attorney for Lawrence Corbi

# TABLE OF CONTENTS

MEMORANDUM REGARDING SENTENCING  . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.    INTRODUCTION AND BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   SENTENCING LENIENCY IS WELL-SUPPORTED  . . . . . . . . . . . . . . . . . .  1

    A.   The Court Has Broad Sentencing Discretion  . . . . . . . . . . . . . . . . . . . . . .  1

        1.   The Nature and Circumstances of the Offense are Less
Aggravated than the Heartland Fraud and Mortgage
Fraud Cases  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

        2.   Larry Corbi Demonstrated His Contrition and Accepted
Responsibility at the Earliest Opportunity  . . . . . . . . . . . . . . . . . .  6

        3.   Larry Corbi's History And Characteristics Show the
Offense is Inconsistent With His True Character . . . . . . . . . . . .  7

        4.   Leniency is Appropriate in Light of the Need for the Sentence
Imposed to Reflect the Seriousness of the Offense, Promote
Respect for the Law, Provide Just Punishment, Afford
Adequate Deterrence, and Sufficiently Protect the Public  . . . . . .  9

        5.   The Kinds of Sentences Available  . . . . . . . . . . . . . . . . . . . . . . . .  10

        6.   The Advisory Federal Sentencing Guidelines  . . . . . . . . . . . . . .  10

        7.   Leniency is Warranted Given the Need to Avoid
Unwarranted Sentencing Disparities  . . . . . . . . . . . . . . . . . . . . .  10

            (a)   Sentences Imposed in Other Fraud Cases Support
Leniency in This Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

            (b)   Sentences Imposed in Fraud Cases in This District
and Nationwide Support Leniency . . . . . . . . . . . . . . . . . .  12

            (c)   Typical Mortgage Fraud Cases Involve More
Aggravated Wrongdoing Than This Case  . . . . . . . . . . . .  13

(d)   Disparate Charging Practices in Matters Involving Mortgage Fraud Support Leniency in This Case  . . . . . . . . . . . . . . .  13

(e)   Other Cases Involving DJ May Support Sentencing Leniency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

8.   Leniency Would Promote Larry Corbi's Ability to Make Restitution to Victims of the Offense Conduct  . . . . . . . . . . . . .  14

B.   Leniency is Supported Because the Advisory Sentencing Guidelines in this Case Are Impacted by the Nationwide Real Estate Meltdown, Which Was Beyond Larry Corbi's Control and Unrelated to His Wrongdoing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

III.   REQUEST FOR RDAP RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . .  17

IV.   REQUEST FOR SOUTHERN CALIFORNIA PLACEMENT  . . . . . . . . . . .  17

V.   OBJECTIONS TO THE PRESENTENCE REPORT . . . . . . . . . . . . . . . . . . .  17

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*,
  552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Booker*,
  543 U.S. 720 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 11

*United States v. Confredo*,
  528 F.3d 143 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Crandall*,
  525 F.3d 907 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Gebbia*,
  07-CR-925 (D. N.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Leonard*,
  529 F.3d 83 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Morad Abu Sliman*,
  05-cr-3056 (N.D. Ill.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Nacchio*,
  573 F.3d 1062 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*United States v. Rojas-Millan*,
  234 F.3d 464 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Weidner*,
  437 F.3d 1023 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Kevin S. Jackson*,
  00-cr-726 (D.N.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Scanlon*,

iii

05-cr-411 (D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES**

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

USSG § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

USSG § 5D1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

USSG § 5F1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

USSG § 5K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

## MEMORANDUM REGARDING SENTENCING

## I.

## INTRODUCTION AND BACKGROUND

Larry Corbi pleaded guilty in this case at the earliest opportunity - before the filing of any changes, and without receiving discovery.  Before then, he offered his cooperation to the government in its investigation of the older and savvy loan broker, ("DJ"), who led him to become in involved in mortgage fraud and pocketed the proceeds of the home equity line of credit loans ("HELOCs") on the property that is the subject of his plea.  Mr. Corbi was just 31 when he was introduced to DJ.  At the time, Mr. Corbi was trying to learn how to become a real estate broker or investor.  DJ touted his acumen and personal success, and waxed about the high profits available in real estate.  Mr. Corbi mistakenly viewed him as a mentor.  Larry Corbi has now gained insight into how he became diverted from a law-abiding and productive life, and is committed to never again running afoul of the law.

Sentencing leniency would be consistent with Larry Corbi's background and the circumstances surrounding his crime.  It also is merited because his offense is among the least sophisticated types of mortgage fraud, and the losses involved are less than half those involved in most mortgage frauds, according to FBI statistics.  In sum, Larry Corbi is a 'little fish' who merits sentencing commensurate with this, so that he can move forward with the life he had before he was diverted: an honest and fruitful life appropriate to an educated, energetic and ambitious young man.

## II.

## SENTENCING LENIENCY IS WELL-SUPPORTED

### A.    The Court Has Broad Sentencing Discretion

This Court is fully empowered to exercise leniency based on the mitigating facts and circumstances in this case.  Pursuant to Title 18 U.S.C. § 3553(a) and *United*

1

States v. Booker, 543 U.S. 720 (2005), sentencing courts are charged with imposing a sentence "sufficient, but not greater than necessary," based on factors enumerated in the statute.  The defense requests that the Court exercise leniency on the grounds set forth below and the combination of mitigating facts and circumstances in this case.

**1.      The Nature and Circumstances of the Offense are Less Aggravated than the Heartland Fraud and Mortgage Fraud Cases**

Larry Corbi's wrongdoing was committed in the blind belief and naive hope that false statements to garner home equity loans could be a "win-win" for him, as an aspiring businessperson, *and* for lenders, as real estate prices continued to climb.  As reflected in his letter to the Court, he has insight into the misguided thinking that led to his crimes, and is remorseful.  *See* Exh A.  He pleaded guilty prior to the filing of any charges in this case, and without receiving any discovery, so that he could "take personal responsibility" for his "past actions and decisions," and move forward with an honest and responsible life.  *Id*.  He is "grateful that the government put an end to this ordeal as it has taught [him] that there are no short cuts in life and that the only path forward is to live an honest, ethical, law-abiding life."  *Id*.

Larry Corbi's offense was applying for four HELOCs on the same property and misleading each lender to believe it would hold a second trust deed, when in fact only one of the lenders could hold the second trust deed.  It was a simple crime of opportunity replicated throughout the country when real estate markets were booming.  DJ taught Mr. Corbi how to get this 'easy money' that was available when Southland lenders were eager to loan funds to borrowers with little or no credit histories, and required relatively little verification.  Larry Corbi fully accepts responsibility for his own wrongdoing and recognizes his personal responsibility, but DJ's influence was significant factor in his wrongdoing.  DJ's motives were later revealed – he pocketed the funds obtained from the HELOCs on the San Jose Street property which is the

subject of Larry Corbi's plea.  DJ also told Mr. Corbi that the HELOCs beyond the first had not funded, but Mr. Corbi later learned otherwise.

Falling for DJ's pitches and submitting false loan applications was within Larry Corbi's control, and thus he accepts personal responsibility for his offenses.  But, the broader circumstances that eventually led to lenders' losses were not within his control.  This case is unlike most frauds, in which the offender knows at the inception that the victims will lose money and s/he alone will profit.  In this case, but for the precipitous drop in real estate prices, lenders may have lost no money, and indeed could have profited.  These features distinguish Larry Corbi's offense from many, if not most, financial crimes carrying comparable "loss" figures under the advisory sentencing guidelines.

The lack of sophistication in Larry Corbi's wrongdoing also is mitigating.  Obtaining multiple HELOCs is among the least sophisticated types of mortgage frauds, many of which involve multiple players, insiders, straw buyers, intricate falsified materials, and complex schemes to perpetrate and conceal the wrongdoing.  The instant case contrasts with typical schemes described by the FBI:

> "The schemes most directly associated with the escalating mortgage fraud problem continue to be those defined as fraud for profit.  Prominent schemes include loan origination, foreclosure rescue, builder bailout, short sale, credit enhancement, loan modification, illegal property flipping, seller assistance, bust-out, debt elimination, mortgage backed securities, real estate investment, multiple loan, assignment fee, air loan, asset rental, backwards application, reverse mortgage fraud, and equity skimming. Many of these schemes employ various techniques such as the use of straw buyers, identity theft, silent seconds, quit claims, land trusts, shell companies, fraudulent loan documents (including forged

3

applications, settlement statements, and verification of employment,
rental, occupancy, income, and deposit), double sold loans to secondary
investors, leasebacks, and inflated appraisals."

*See* Federal Bureau of Investigation, "2009 Mortgage Fraud Report Year in Review,"
available at:  http://www.fbi.gov/stats-services/publications/mortgage-fraud (last
visited April 27, 2011).

Without minimizing the seriousness of any fraudulent conduct, Larry Corbi's
wrongdoing in this case is among the least sophisticated types of mortgage fraud.  His
actions were particularly naive when DJ's role is considered.  Larry Corbi was in his
early 30's, and DJ was playing the role of a supposed mentor to him.  Mr. Corbi
essentially followed DJ's directions and signed whatever documents he was advised
sign.  DJ had Mr. Corbi use his own identity to apply for the HELOCs, and DJ then
pocketed funds obtained under his tutelage.  Larry Corbi's gullibility, and the extent
of DJ's influence, is illustrated by the fact that Mr. Corbi gave DJ blank checks which
DJ used to make off with the HELOC funds.  DJ also persuaded Mr. Corbi to lease –
under Mr. Corbi's name - a luxury car for a member of DJ's family.  *See* PSR, p. 7,
note 1.[1]  Mr. Corbi's naivete further supports the conclusion that the instant offense
was a low-sophistication crime relative to others.

Sentencing leniency also is warranted because this case appears to be at the
lower end of the spectrum of mortgage fraud cases nationwide.  The loss amount in
this case – $356, 644 according to the government – is substantially lower than the
heartland federal mortgage fraud prosecution.  According to the most recently
available FBI Statistics, "Sixty-six percent of all pending FBI mortgage fraud

---

[1]      Persuading others to take out multiple HELOCs evidently was DJ's
*modus operandi* – at lease five others have been prosecuted in this District in similar
cases involving DJ.  *See* PSR, p. 9, note 2.

4

investigations during FY 2009 involved dollar losses totaling more than $1 million."
*See id*.

While mortgage fraud is a prevalent problem, the sentence in this case need not be guided by the nationwide impact of mortgage fraud. The amount involved here is a minuscule proportion of the total loss attributable to fraudulent loans nationwide. As described by the FBI: "While the total dollar loss attributed to mortgage fraud is unknown, First American CoreLogic (using mortgage loan data representing 97 percent of all U.S. properties) estimates that $14 billion in fraudulent loans were originated in 2009 ($7.5 billion in FHA loans and $6.5 billion in conforming loans)." The losses in this case are a negligible portion of that total.

Additionally, the role of the HELOC lenders might also be considered in evaluating the nature of the offense conduct. The widely-reported lax lending practices employed by banks – including at least two of the lenders herein, Countrywide (now owned by Bank of America) and WAMU (now in FDIC receivership) – have been criticized for facilitating frauds. Admittedly it provides no legal defense to Mr. Corbi that lenders aggressively promoted real estate lending to uncreditworthy borrowers during the market boom. But, the temptation such practices posed to a young, aspiring real estate entrepreneur like Mr. Corbi, and the opportunity the banks created through aggressive lending promotions, facilitated the fraud and contributed to the banks' losses. *See, e.g., FDIC Sues Former Top WaMu Execs, Alleging 'Gross Negligence'*, Seattle Post-Intelligencer (March 16, 2011) (FDIC files suit against WAMU executives: "WaMu recklessly made billions of dollars in risky house loans 'knowing that the real estate market was in a 'bubble' that could not support such a risky strategy over the long term . . . . 'This relentless push for growth was exemplified by WaMu's advertising slogan, 'The Power of Yes,' which promised that few borrowers would be turned away.' . . . Risky loan options included . . .

home-equity lines of credit piled on top of first mortgages as home prices bubbled . . . . WaMu approved many of these loans with little or no documentation of income or assets . . . . 'Defendants knowingly pushed their Higher Risk Lending Strategy at a point in the housing cycle when prices were unsustainably high' the lawsuit says. 'WaMu focused its growth in a few geographic areas -- notably California and Florida -- where housing prices had escalated most rapidly and were most at risk for significant decline'.").[2]

## 2. Larry Corbi Demonstrated His Contrition and Accepted Responsibility at the Earliest Opportunity

Larry Corbi agreed to plead guilty prior to the filing of any charges in this case, and without the government producing any discovery to the defense. Before Mr. Corbi's plea, the defense gave a detailed proffer and offered Mr. Corbi's assistance in the government's ongoing investigations. Mr. Corbi self-surrendered and the plea agreement was filed simultaneously. The preceding saved the government resources, and reflects Mr. Corbi's complete acceptance of responsibility and contrition, desire to immediately get back on the right side of the law, and commitment to never again running afoul of the law.

## 3. Larry Corbi's History And Characteristics Show the Offense is Inconsistent With His True Character

---

[2]    *See also Countrywide Financial Corporation News*, NYT (Jan. 20, 2011) ("[N]o company pursued growth in home loans more aggressively than Countrywide. . . . The S.E.C. said that the three [Countrywide] executives misled investors by failing to disclose the lax guidelines and the growing portion of subprime loans that it was creating."); *cf. GMAC Spotlight on 'Robo-Signer'*, WSJ (Sept. 22, 2010) ("mortgage-servicing giant GMAC Mortgage Co. halted foreclosures in 23 states due to questions about documents signed by one of its robo-signers . . . . GMAC confirmed that it suspended foreclosure sales and evictions in 23 states so that it can investigate its foreclosure procedures").

Larry Corbi's offense conduct stands in stark contrast to his broader life and the character traits described by those who know him best.  As he writes in his letter to the Court, "I've always been a person who's been passionate about helping others and contributing to the success of others."  Exh A.  He shows insight into how he deviated from this path, stating:

> "For most of my life I've been a person who has strived for more and pushed myself very hard to succeed.  Knowing that I came from a lower middle class family that had always struggled to get by, I put a ton of pressure on myself to succeed so I could be the one to break through the lower middle class barrier and at the same time, help my family get out of the amount of debt they incurred raising three kids.  I had always felt like I was running out of time and pushed myself so hard and fast that I ended up going down a path that I would forever regret.  I had convinced myself that I could be like the financial guru's I had studied but I put too much pressure on myself to make it happen overnight.  What I failed to realize is that I already have everything I need and true success does not depend on money alone."

*Id*.  The letter to the Court from Larry Corbi's parents shows their pride in their son's early accomplishments, and describes his shame in telling family members about his crime.  *Id.*  They reinforce that their son already "has learned a hard, yet valuable, lesson from this situation, and he knows not to repeat this type of action in the future." *Id*.  Larry Corbi's boss, Brian Fanale, describes Mr. Corbi's many positive traits, including his "unparalleled" work ethic, creativity, and calm temperament.  He, too, notes Mr. Corbi's remorse, stating:

> "When Larry hit me and my partners with the news that he would be going to jail, we honestly didn't believe him.  He was about in tears when

he told us the news because he's got that much passion behind his work. We could tell immediately that he was disappointed in himself and hurt by the fact that he'd be leaving our team to spend time in jail.  I could tell that Larry was very heartfelt and extremely ashamed for what he had done.  At the same time it sounded like he was led astray at a young age by an older scam artist.  I guess that's what can happen to a young, trusting, optimistic kid when you get him around a dirty scam artist who assures him that everything he's doing is 'legal'. . . .  Please take this letter into consideration during sentencing.  Larry's a good kid."

*Id*.  Larry Corbi's family members, Nick & Shani Gianis, describe the Larry Corbi they know in glowing terms, stating:

"After graduating from college he had a deep desire to succeed at the professional level.  At a young age he searched for mentors and studied some of America's most successful entrepreneurs.  I know him very well and I know he has always wanted to succeed the right way.  My wife and I mentored Larry when he was younger and then he became a mentor to us in many ways.  When most entrepreneurs focus most of their time and energy on their own success, Larry spends a lot of time trying to help other people succeed.  He also spends a lot of time and energy trying to make other people happy too."

*Id*.  They also describe Mr. Corbi's contrition:

"He has discussed his mistakes openly with his family and is taking full responsibility for his actions.  I have been very impressed with how he has handled this situation and I know that he has learned from his mistakes and that he will not put himself in this position ever again.  He informed us recently of his plan to continue to improve himself during

8

his sentence so he can make a positive difference in the lives of others
when he is able again."

*Id.*; *see also* Letter from Gary Robinson (describing Larry Corbi as "an honest person focused on motivating himself and others to achieve their positive best in life"); Letter from Michael Maloney (Larry Corbi's former employer describes him as someone who "has always demonstrated a high degree of integrity" and "never shown me anything but honesty, integrity and loyalty"); Letter from Jon Tulio (describing Mr. Corbi's strong commitment to self-improvement, stating, "I have watched him embrace education as a tool to progress," and describing Larry Corbi's "passionate pursuit of personal development and his desire to help others find their dreams and experience fuller lives, personally and professionally. . . .  I have no doubt that he has learned from this and will not find himself in this situation or any other circumstances that would put him in a position with breaking the law again.").

In sum, letters to the Court from both Larry Corbi and those who know him best reinforce the conclusion that engaging in criminal conduct is inconsistent with his character, that he is remorseful, and that he has gained the kind of insight that safeguards against recidivism.

**4.    Leniency is Appropriate in Light of the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Sufficiently Protect the Public**

Sustaining a felony conviction alone is a serious punishment given Larry Corbi's relative youth, and the many adverse collateral consequences that will flow from a felony conviction from someone who aspired to be professionally successful in investing and real estate.  He likely will be disabled from obtaining many professional licenses, and unable to secure employment with companies providing financial, real

estate or related services.  These tough and life-long collateral consequences pose a hefty penalty in addition to that imposed by the Court, and support sentencing leniency.

Larry Corbi's early acceptance of responsibility and contrition reflect his respect for the law and commitment to leading a law-abiding life in the future. Accordingly, sentencing leniency is consistent with promoting respect for the law, affording adequate deterrence and sufficiently protecting the public.

### 5.    The Kinds of Sentences Available

This Court is not limited regarding the kind of sentence that may be imposed.

### 6.    The Advisory Federal Sentencing Guidelines

Updated information provided by the government indicates an a sentencing guideline adjusted offense level of 16 (21-27 months).[3]  In light of *Booker* and its progeny, the advisory sentencing guidelines are a starting place, but entitled to no greater weight than other factors.

### 7.    Leniency is Warranted Given the Need to Avoid Unwarranted Sentencing Disparities

### (a)    Sentences Imposed in Other Fraud Cases Support Leniency in This Case

Many high-profile cases illustrate the reasonableness of sentencing leniency in this case.  For example, Bernard Madoff, received 150 years for a Ponzi that caused investor losses of $65 billion, which equates to one month's imprisonment for every $36.1 million of loss that he caused.  *See* 09-cr-213-DC (S.D.N.Y., June 29, 2009). Even if judged by the yardstick applicable to the most infamous white-collar

---

[3]    The defense cooperated in the government's assessment of loss by providing information received from one lender.  However, the defense does not have investigative or discovery materials, and therefore has not made an independent assessment of loss.

defendant ever, under this methodology, Larry Corbi should be sentenced to less than a day in prison.  The same is true if he were sentenced to avoid disparity with the sentence imposed on former General Re Corporation CEO Ronald Ferguson (who received 24 months for a scheme in which AIG shareholders lost over $500 million in a phony reinsurance deal), or the sentence imposed on Mark Turkcan, president of First Bank Mortgage based in St. Louis, who misapplied $35 million in loans that resulted in a loss of over $24 million, and  received a sentence of a year and a day. *See* 08-cr-428-DJS, Docket No. 52 (E. D. Mo., June 11, 2009).[4]

It should be noted that the preceding examples of notorious offenders involved aggravating factors existed which do *not* exist here (*e.g.,* abuse of a position of trust, numerous victims, sophisticated means, multiple counts, organizer/leader), thus further supporting sentencing leniency here in the interest of avoiding unwarranted sentencing disparities.

_____

[4]      *See also, e.g., United States v. Kevin S. Jackson*, 00-cr-726 (D.N.J.) (defendant in bond fraud sentenced to 1 month for each $392K of loss); *United States v. Morad Abu Sliman*, 05-cr-3056 (N.D. Ill.) (defendant convicted of conspiring to negotiate counterfeit/forged checks received 1 month for each $456K of loss), *United States v. Joseph Nacchio* , 05-cr-545 (D. Colo.) (former Qwest CEO convicted on 19 counts of insider trading received 1 month for each $388K of loss); *United States v. Scanlon,* 05-cr-411 (D.D.C.) (business partner of Abramoff who participated in scheme that bilked Native American tribes received 1 month of imprisonment for each $1M of loss under cooperation plea); *United States v. Gebbia*, 07-cr-925 (D. N.J.) (paralegal involved in $8M mortgage-fraud received 2 years probation for tax fraud under cooperation plea).

11

**(b)     Sentences Imposed in Fraud Cases in This District and Nationwide Support Leniency**

According to the most recent Sentencing Commission statistics available, most defendants convicted of fraud in the Central District received ***below-USSG guideline*** sentences (specifically, **51.3%** received below-USSG guideline sentences;).[5]  If cooperators are excluded from consideration, Central District Courts imposed below-guideline sentences in **21.9%** of all fraud cases.  *See id.*  In this case, unlike most fraud cases not involving cooperators, Larry Corbi *offered* to cooperate with the government, agreed to plead guilty before the filing of any charges and without receiving any discovery, and voluntarily disclosed incriminating information beyond the matters initially under investigation by the government – all reflections of his acceptance of responsibility and early efforts to make amends for his wrongful conduct.

Sentencing Commission statistics further highlight the reasonableness of leniency in this case.  The average (or 'median') defendant sentenced for fraud nationwide received 18 months of imprisonment (the figure was 24 months in the Central District of California).  *See id.*, Table 7.  This includes defendants whose cases involved aggravating factors not present here, *e.g.,* abuse of a position of trust, numerous victims, sophisticated means, multiple counts, and/or leading role adjustments.  The PSR recommendation of a 30-month sentence seems disproportionate when compared to the typical terms imposed on others in fraud cases, both nationwide and in this District.

---

[5]     *See* Exh B, USSG Statistical Information Packet (FY 2009, C.D. Cal.), at Table 10, http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/ State_District_Circuit/2009/cac09.pdf (last viewed April 27, 2011).

**(c)      Typical Mortgage Fraud Cases Involve More Aggravated Wrongdoing Than This Case**

Unlike this case, many federally prosecuted mortgage fraud cases involve individuals who take advantage of their positions as industry 'insiders', such as loan brokers, loan originators, processors, underwriters or appraisers; or who occupy positions of trust within the financial institutions that they defraud, such as loan officers, attorneys, or corporate officers or directors.  Available statistics do not provide sufficient detail to quantify these factors for comparative purposes.  But, if the spectrum of mortgage offenses starts with a borrower who includes false information on a home loan application, and ends with an executive who perpetrates large-scale institutional fraud resulting in the collapse of a lender, it would be fair to conclude that Larry Corbi falls at the least aggravated end of a spectrum of offenders.

**(d)      Disparate Charging Practices in Matters Involving Mortgage Fraud Support Leniency in This Case**

The Department of Justice has declined to even charge some 'big fish,' such as Angelo Mozilo, the former CEO of Countrywide, a victim herein (now Bank of America) – after he remitted $45 million in ill-gotten profits and paid $22.5 million in civil penalties without admitting or denying accusations against him.  Similarly, the DOJ declined to prosecute AIG executive Joseph J. Cassano, who earned hundreds of millions running the AIG division at the heart of the company's collapse arising from credit default swaps purporting to insure investors against default on mortgage-backed securities.  As reflected in a New York Times article reprinted on a U.S. Senator's website, this is "consistent with what many people were worried about during the crisis, that different rules would be applied to different players.  It goes to

13

the whole perception that Wall Street was taken care of, and Main Street was not."[6]
The defense appreciates the challenges of prosecuting 'big fish,' who often are in
positions that enable them to insulate themselves from the crimes in their own
trenches, and understands that the DOJ's charging practices may be beyond the
control of all involved in this case.  But, it would seem unjust to severely punish a
minor player like Mr. Corbi – whose offense was as far removed from 'Wall Street' as
they come – given the broader picture of federal mortgage fraud prosecutions.

### (e)    Other Cases Involving DJ May Support Sentencing Leniency

Five mortgage fraud cases filed in this District share commonalities with this
case, although Larry Corbi had no relationship with the defendants therein.[7]
Specifically, the cases also involved DJ, who taught and encouraged Larry Corbi to
take out multiple HELOCs on properties.  The defense is unable to determine from
public records what sentences any of the defendants in these cases may face.

### 8.    Leniency Would Promote Larry Corbi's Ability to Make Restitution to Victims of the Offense Conduct

Larry Corbi is committed to making restitution for his wrongdoing.  While a
felony conviction likely will impede his income-earning ability in the future, given his
age it is likely that he will be able to make restitution.  Sentencing leniency would
promote his ability to timely do so.

---

[6]    *See*
http://sanders.senate.gov/newsroom/news/?id=f66dad6d-040d-4616-94ec-ef70f354eb
0e (last visited April 29, 2011), *quoting* U. of Penn. Professor David A. Skeel.

[7]    *See United States v. Hong*, 08-cr-877-AHM (June, 2011 sentencing);
*United States v. Kim*, 10-cr-1069-SJO (sealed stipulations to continue); *United States
v. Park*, 10-cr-1070-SVW  (sealed stipulations to continue); *United States v. Yea*,
10-cr-1071-UA  and *United States v. Lee*, 10-cr-1090-AHM (May 31, 2011 trial).

**B.    Leniency is Supported Because the Advisory Sentencing Guidelines in this Case Are Impacted by the Nationwide Real Estate Meltdown, Which Was Beyond Larry Corbi's Control and Unrelated to His Wrongdoing**

The unanticipated and precipitous drop in real estate prices may be considered a mitigating factor in this case.  The real estate pricing bubble that preceded the nationwide real estate crisis shows that a precipitous drop in prices was not 'reasonably foreseeable' to even the investing elite, let alone a newbie like Larry Corbi.

The Ninth Circuit's ruling in *United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008) endorses a "realistic, economic approach to determine what losses the defendant truly caused or intended to cause."[8]  *See also United States v. Leonard*, 529 F.3d 83, 92-93 (2d Cir. 2008) (error not to reduce "loss" by investments' value, even if victims would not have purchased them but for fraud and there was no ready resale market).[9]  The *Crandall* court commented on the "volatile nature of the real estate market," which it characterized as "wholly independent of Defendants' culpability."

---

[8]    In *Crandall*, where victims purchased illegally converted condominiums, the Ninth Circuit found (it was error not to reduce) "loss" by the value of the properties, because it was "improbable from a realistic, economic perspective that the 'condominiums' had no value to the victims . . . even though the units may have been difficult or impossible to resell."

[9]    Tangential or non-economic harms, interest or penalties, and prosecution costs are not included in "loss," and credits against "loss" include (1) the "fair market value" of property returned to victims before the offense was detected or the defendant should have known it was about to be; and (2) amounts victims recover from selling collateral or its fair market value at sentencing.  *See, e.g., United States v. Weidner*, 437 F.3d 1023, 1047-48 (10th Cir. 2006) (error to calculate intended loss without considering value of collateral pledged to secure increased line of credit).

15

1   These comments suggests that unanticipated market swings are mitigating.[10]

2       But for the precipitous decline in the real estate values subsequent to the offense

3   conduct herein, the banks in this case – including enthusiastic lenders like

4   Countrywide and WAMU – may have profited, or at least lost substantially less

5   money.  Thus, this case is far less aggravated than most economic crimes involving

6   comparable loss amounts.

7       Most of the economic crimes to which USSG § 2B1.1 applies do not involve

8   losses resulting from factors beyond a defendant's control.  In the heartland of

9   offenses under Section 2B1.1 (*e.g.*, larceny, embezzlement, theft, stolen property,

10  property damage, forgery, counterfeiting, misappropriation of trade secrets, and

11  virtually all frauds not involving real estate/securities/commodities), the defendant

12  knows with certainty that the victim will suffer an economic loss, and knows the full

13  amount of that loss.  Here, lenders would have lost little or no funds but for the

14  dramatic and unanticipated decline in the real estate market.  The defense requests that

15  the Court consider this in evaluating the appropriate weight to be given to lenders'

16  losses in imposing sentence.

17      At a minimum, since most economic crimes do not involve losses resulting

18  from an unanticipated drop in market prices that was beyond the defendant's control,

19  this case should be viewed as being on the least aggravated end of the spectrum of

20

21          [10]    *See also United States v. Nacchio*, 573 F.3d 1062, 1081 (10th Cir. 2009)

22  ("if the impact of unrelated twists and turns of the market is ignored in the sentencing

23  calculus," a defendant "is likely to suffer a sentence that is detached from his or

    her individual criminal conduct and circumstances."); *United States v. Zolp*, 479 F.3d

24  715, 719 (9th Cir. 2007) (in securities fraud case, "the court may not assume that the

25  loss inflicted equals the full pre-disclosure value of the stock; rather, the court must

    disentangle the underlying value of the stock, inflation of that value due to the fraud,

26  and either inflation or deflation of that value due to unrelated causes."); *United States*

27  *v. Confredo*, 528 F.3d 143 (2d Cir. 2008) (defendant entitled to show he subjectively

    intended less loss than aggregate face amount of fraudulent loan applications).

28

cases involving comparable losses.

## III.

## REQUEST FOR RDAP RECOMMENDATION

Larry Corbi has suffered from alcohol abuse, which he periodically has addressed by trying to stop drinking, and once attending an AA meeting.  He therefore seeks a recommendation that the U.S. Bureau of Prisons place him in a Residential Drug Abuse Program provided that he meets the BOP's criteria for placement therein. PSR ¶¶ 77-78.

## IV.

## REQUEST FOR SOUTHERN CALIFORNIA PLACEMENT

Lawrence Corbi's family resides in Southern California, and therefore he seeks the Court's recommendation that the BOP place him at the Federal Prison Camp at Lompoc, or in another facility in Southern California.

## V.

## OBJECTIONS TO THE PRESENTENCE REPORT

Lawrence Corbi objects to the Probation Officer's letter to the Court, and the Presentence Report ("PSR") as follows:

**Letter to the Court, Guideline Summary, PSR ¶¶ 3, 5, 17, 19, 30-32, 36, 38, 40, 115, 132.**

The defense understands that lender records obtained by the government support its calculation of a loss and restitution amount of $356,644.

The defense submits that "Countrywide (2nd)" should not be included in loss calculations because the $43,000 lost by the lender was a consequence of the drop in real estate prices.  Because a HELOC is a non-recourse loans, what would be material to a HELOC lender is the equity available in the property and its ability to obtain a second trust deed.  Countrywide (now Bank of America) had accurate information

17

about the equity available in the property because it was the purchase money lender and held the first trust deed on the San Jose Street property (PSR ¶ 31).  It also obtained what it bargained for – a second trust deed on the property.  Therefore, the $43,000 that Countrywide/Bank of America lost on the HELOC appears to be a consequence of the drop in real estate prices, and not a result of the false statements in the loan application (the effect that there were no loans on the property beyond the purchase money mortgage).[11]

According to the government, the GMAC loss amount is $191,000 (*not* $199,000).

 If the government figure determined by the government ($356,644) were reduced by the loss corresponding to the "Countrywide (2nd)," the loss would be $313,644.  This would not change the advisory guideline range calculated by the government (21-27 months).  It would, however, reduce applicable restitution to $313,644.

**Letter to the Court, p. 3, Supervision Condition 7**.

The PSR recommends "20 hours of community service per week," except when excused by the Probation Officer for specific reasons.  However unlikely to occur, such a sentence could impose a potential community service term of ***5,400 hours***.[12]

---

[11]     The government's position is that Countrywide would not have extended the HELOC but for the false statements in the loan application, and therefore it is a victim.  The defense has found no authority directly addressing this unique fact pattern - a false application to a lender which already had accurate information about the equity available in the property at the time it extended the loan, and in fact obtained the bargained-for security upon which the loan was extended.  Analogous authority is set forth in Part II(B) above.  In light of this, the defense submits that the rule of lenity weights in favor of excluding the loss.

[12]     The recommended supervision term is 5 years (60 months), which the defense submits is greater than necessary given the dated nature of the offense

18

1   This is inconsistent with the advisory sentencing guidelines, which provide that

2   "Community service generally should not be imposed in excess of 400 hours" (*see*

3   5D1.3(e)(3) & 5F1.3, Application Note 1), and would be disproportionate to the

4   offense.

5          **Letter to the Court, p. 3, Supervision Condition 11**.

6          The PSR recommends precluding Mr. Corbi from "any position that requires

7   licensing and/or certification by any local, state or federal agency" without the

8   Probation Officer's approval.  This condition is over-broad and unrelated to the

9   reasonable purposes of supervision in this case given the many jobs unrelated to the

10  offense that require licenses or certificates (*e.g.,* being a manicurist or pet sitting).  *Cf.*

11  Supervision Condition 10 ("any business involving loan programs or real estate sales

12  or investment programs").

13         **Letter to the Court, p. 4, fourth paragraphs.**

14         Larry Corbi first learned that the second and third HELOCs on the San Jose

15  Street property had been funded when he attempted a short sale of the property.

16         **Letter to the Court, p. 5, second & third paragraphs.**

17         The PSR states that Mr. Corbi's "involvement in additional loan fraud also

18  shows that the sentencing guidelines do not adequately account for the totality of his

19  conduct .. .."  The defense submits that Mr. Corbi's voluntary disclosure of

20  wrongdoing of which the government was unaware was part of his concerted efforts at

21  self-rehabilitation, and should be viewed in mitigation, and not used as a basis for

22  increased punishment.[13]  His voluntary disclosure of wrongdoing shows his good

23

24  _____

25  conduct and Larry Corbi's rehabilitation.

26         [13]   *See Gall v. United States*, 552 U.S. 38, 59 (2007) (defendant's "self-
27  motivated rehabilitation . . . lends strong support to the conclusion that imprisonment
    was not necessary to deter [him] from engaging in future criminal conduct or to

28
                                        19

faith, and evidences the unusual extent to which he has been forthcoming in his cooperation with law enforcement.

**Letter to the Court, p. 6, PSR ¶ 84, 98, 108-110**.

The PSR states that Mr. Corbi is involved in "other MLM activities" or "unreported business in the MLM industry" that the Probation Officer located on the internet or through other investigation.  The defense has not been provided with any materials supporting the statements in the PSR.  Accordingly, the defense is unable to evaluate the accuracy or relevance of this information, and on such grounds objects to it being considered for sentencing purposes.  However, it appears that most of what the Probation Officer has located through independent research are electronic remnants of dormant or defunct entrepreneurial efforts (*e.g.*, an internet domain name, a blog) that are not related to this case, nor within the scope of the materials requested in Probation Form 48F that Mr. Corbi has in his possession.

The website visited by the Probation Officer is not "selling any products" – the site does not even contain a "market basket" or have any other vending feature.

The PSR appears to suggest that the defense may not have fully cooperated with the Presentence process, or provided all required documentation.  This is incorrect.  All information requested of Mr. Corbi has been provided to the Probation Officer, including all information set forth in Probation Form 48F to the extent that Mr. Corbi has such information.[14]  The defense first provided completed presentence forms[15] and

protect the public from his future criminal acts"; upholding sentence of 36 months' probation where USSG guideline provided for 30-37 months of imprisonment).

[14]      These materials include, *inter alia*, tax returns, copies of educational verification, proof of citizenship, apartment lease, bank records documenting income and expenses, current employment agreement, phone bills, gas & auto maintenance receipts, religious contributions, rental expense, auto title, all documents in Mr. Corbi's possession regarding real properties that are the subject of the plea and other

supporting materials to the Probation Office in December 22, 2010.  The defense completed the forms *a second* time, and provided them to Probation Officer, after the Probation Officer indicated on January 25, 2011 that updated information should be provided, blank spaces should be filled in with "zero," and additional information should be included in them.  Mr. Corbi responded to all questions asked by the Probation Officer during the Presentence Interview except to the extent that he acted upon advice of counsel.[16]  The defense also provided written responses to additional questions first raised by the Probation Officer after the Presentence Interview.  Finally, although not obligated to do so, the defense obtained from third-party sources, and provided to the Probation Officer, additional documentation requested by the Probation Officer (*e.g.,* copies of Mr. Corbi's birth certificate, college diploma).  In sum, the defense endeavored to fully cooperate with the Probation Officer's investigation, including providing *approximately 300 pages* of verification materials (including complying with such detailed requests as providing grocery and fast food receipts to substantiate Mr. Corbi's estimated food expenses).

**PSR ¶¶ 5, 8, 18, 28, 42, 44, 45, 46, 49, 50, 84, 106, 108-110.**  The defense has

---

wrongdoing voluntarily admitted by Mr. Corbi, bankruptcy records, and articles of incorporation for CC Sessions Limited (dissolved).

[15]     These included executed copies of the PROB1 Worksheet for Presentence Report, PROB 48 Net Worth & Cash Flow Statements & Declaration, PACTS 70-1 Authorization to Release Confidential Information, OMB 0960-0566 SSA Consent for Release of Information, and Dept. of Treasury 4506-T (Request for Transcript of Tax Return) forms.

[16]     Mr. Corbi even responded to such intrusive questions as: "If you go to jail, do you think you and your girlfriend will break up?" [Mr. Corbi's answer: "I guess we'll probably break up"];  "Will that be because you break up with her, or because she breaks up with you?"; and "Who paid for your lawyer?" [Mr. Corbi's answer: "I borrowed the money from my family"].

not been provided with discovery, including FBI reports; the AUSA's memorandum and "statements made by the AUSA and the FBI SA" to the Probation Officer that are referenced in the PSR; or the investigative materials on which various statements in the PSR evidently are based.  Accordingly, the defense is unable to evaluate the accuracy or relevance of this information, and on such grounds objects to it being considered for sentencing purposes.

**PSR ¶ 11.**

The $158,500 HELOC (the "Countrywide  (2nd)") was in fact secured by a second trust deed.

**PSR ¶ 12, 13.**

DJ directly caused the transfer of funds to Mr. Corbi's Bank of America account.  DJ then withdrew the funds using blank checks Mr. Corbi had given to him.  Mr. Corbi thereafter learned that the loans had been funded.

**PSR ¶ 17.**

There were 4 loans on the property, and one was a Countrywide *purchase money mortgage*.  The corresponding first trust deed would have been recorded at the time of the acquisition (*i.e.*, prior to submission of the 3 HELOC applications, or funding of those loans).

**PSR ¶ 20.**

USSG 2B1.1, Comment 3(D) excludes from loss "(i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed upon return or rate of return, or similar costs.  (ii) . . . [C]osts incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense."

**PSR ¶ 22.**

DJ pocketed all of the HELOC proceeds on the San Jose property - the proceeds were not "split with Mr. Corbi," as DJ had told Mr. Corbi they would be.

**PSR ¶ 34.**

The relative roles of DJ and Larry Corbi may be viewed as a mitigating factor. *See United States v. Rojas-Millan*, 234 F.3d 464 (9th Cir. 2000) (minor role adjustment determination should be made by reference to "all participants in the criminal scheme for which he was charged").

**PSR ¶ 50.**

Larry Corbi was not knowingly involved with any "straw borrowers." Although the defense has not seen the documents referenced in Paragraph 50, Mr. Corbi recalls borrowing money from DJ, who gave him checks drawn on the accounts of others who Mr. Corbi believed at the time were associates of DJ.

**PSR ¶ 98.**

The articles of incorporation of CC Sessions Limited, a dissolved company, were provided to the Probation Officer on a diskette on February 2, 2011.

**PSR ¶ 99 & footnote 8.**

The $141.24 in monthly cellular phone bills incurred by Mr. Corbi (and set forth in the PACTS 726, Supplement to Personal Financial Statement form) is not included within the $142.25 in home-based business costs that Mr. Corbi expends each month (as set forth in the PROB 48B form, p. 3).

**PSR ¶ 101(a).**

The referenced $600 payments were reimbursement for travel expenses incurred by Mr. Corbi while working for My Lead System Pro d/b/a Upward Enterprises (a copy of his employment agreement and documentation of his income was provided to the Probation Officer). The payments were not "extra payments" or a "discretionary bonus." Larry Corbi's employment commissions are not more than $5,000 per month.

**PSR ¶ 101(b).**

23

The referenced $4,572.18 deposit was a tax refund, not income.

**PSR ¶¶ 111, 112.**

Mr. Corbi does not have the ability to pay the full amount of restitution immediately, but does not object to paying 10% of whatever his future gross monthly income may be, or $100, whichever is greater.

**PSR ¶ 124.**

Under USSG 5E1.2, the advisory sentencing guideline fine corresponding to the instant offense (18 U.S.C. § 1344), and the applicable adjusted offense level, Level 16, is from $5,000 to $1,000,000.

**PSR ¶ 132.**

According to the government, the GMAC guideline loss amount is $191,000 (*not* $199,000). As set forth above, the Bank of America loss (arising from the "Countrywide (2nd)") appears to be a loss resulting from the market-wide drop in real estate prices, rather than the false statements in the application submitted to Countrywide.

24

# VI.

## CONCLUSION

For the reasons set forth herein, and in the accompanying letters to the Court, the defense requests that the Court exercise leniency in imposing sentence on Larry Corbi.

Dated: May 2, 2011

Respectfully submitted,

LAW OFFICES OF EVAN A. JENNESS


_____/ss/_____
EVAN A. JENNESS
Attorney for Lawrence Corbi

To The Honorable Dales S. Fischer,

Your Honor, if I had a chance to go back in time and talk to this young, ambitious, eager, but impatient man to teach him there's a more honest way to build wealth without trying to take short-cuts or being in such a rush…I would absolutely do it.

Am I sorry and remorseful about making such a bad decision?  Yes, more than anyone will ever know.  I know I've deceived banks and institutions to incur financial losses, put other honest people in jeopardy, disappointed and stressed loved ones.  I had convinced myself into believing this was the way to conduct business…or even live an honorable life for that matter.  That's one of the major reasons why I pleaded guilty; in order to live an accountable life I have to take personal responsibility for my past actions and decisions.

I've always been a person who's been passionate about helping others and contributing to the success of others.  As a result of this situation, I have realized that the only path forward is to be honest with myself and those around me.  This situation has caused me and others a lot of stress and grief but I have also come to realize that I can use this experience to continue to help others.  For this, I'm grateful that the government put an end to this ordeal as it has taught me that there are no short cuts in life and that the only path forward is to live an honest, ethical, law-abiding life.

For most of my life I've been a person who has strived for more and pushed myself very hard to succeed.  Knowing that I came from a lower middle class family that had always struggled to get by, I put a ton of pressure on myself to succeed so I could be the one to

break through the lower middle class barrier and at the same time, help my family get out of the amount of debt they incurred raising three kids.  I had always felt like I was running out of time and pushed myself so hard and fast that I ended up going down a path that I would forever regret.  I had convinced myself that I could be like the financial guru's I had studied but I put too much pressure on myself to make it happen overnight.  What I failed to realize is that I already have everything I need and true success does not depend on money alone.

I have also learned a valuable message about the company I keep.  I made the mistake of following an unethical person for all the wrong reasons.  I will never make that mistake again and will always do my due diligence when working with other business people.  My goal is to learn from this experience and to help others avoid the mistakes I made.  I know the youth in my family will initially be very disappointed with me and shocked that I allowed myself to get into this situation but I intend to show them that I am taking full responsibility for my actions and this is the greatest lesson I can teach them.

Looking forward, I am planning on continuing to learn and grow while serving my sentence.  I still have big ambitions for my future but I am shifting my priorities to focus on growing my faith in God, continuing to help my family and friends, and to build a financial foundation with an honest and ethical effort no matter how long it takes.  In order to pay my restitution I will seek assistance from an ethical financial advisor.  I've already joined a network called, Crown Financial Ministries, and I hope to learn God's way for building an honest and ethical financial foundation so I can teach others when my sentence is completed.  I am also planning on writing a children's book while serving

my time so I can speak to kids at schools, institutions and/or youth groups so they will

never follow a path similar to this situation.

Additionally, some of the books I plan on reading during my sentence consist of The

Bible, books on Integrity like "Integrity: The Courage to Meet the Demands of Reality,"

and "The Power of Integrity: Building a Life without Compromise" as well as books on

ethics like "Business Ethics: Ethical Decision Making & Cases" just to name a few.  I

feel books on personal development will definitely help me to understand my behavior

and why I made the decision I did.  So, I will be reading books about Neuro-Linguistic

Programming like, "Change Your Mind-and Keep The Change: Advanced NLP

Submodalities Interventions."

Your Honor, in closing, I hope and pray that you will find a way to be as lenient as

possible with my sentence.  I am fully prepared to serve the sentence you decide and

know I will make a positive impact on other people while serving.  Of course, I'm

already looking forward to being able to make a positive impact on society once my

sentence is completed.  I intend on being a positive world changer and am ready to get

started towards that goal.

Thank you so much for considering my letter.

Kindest regards,

Larry P. Corbi

Larry and Dorothy Corbi

Santa Ynez, CA 93460


January 20, 2011


The Hon. Dale S. Fisher
United States District Judge
United States District Court
255 East Temple Street
Los Angeles, CA 90012

Your Honor,

We are the parents of Larry Corbi, Jr. He is the second of our three grown children. We
are proud of the life Larry has led and the things he has accomplished. We are writing
this letter to introduce you to our son's true nature in hopes that you will see beyond his
one mistake in judgment that brought him to your court.

We can't find the words to describe the pain we felt when we learned of our son's
troubles. He has never been in this kind of trouble before, and he had a very hard time
trying to tell us about what happened. He knew it would hurt us to hear about the
situation he was in and the fact that he might have to go to prison.

As a child, Larry Jr. was very creative, almost a performer, making everyone in the
family laugh. He had such a great personality, and the younger kids in our family always
wanted to be around him because he was so much fun to be with.

He did well all through elementary and high school. After graduation he attended the
following Colleges:

| | |
|---|---|
| 1994-1996 | Sierra University, Riverside, California |
| 1996-1997 | Loma Linda University, Redlands, California |
| | Associate of Arts Degree, Occupational Therapy |
| 1998-2001 | DeVry Institute, Pomona, California |
| | Bachelor of Science Degree, Business Administration |

He has many close friendships and very close family ties. We are a large family that
supports one another in times of hardship. It was hard for him, but during the past few
months Larry has gone to each of his aunts and his grandmother to tell them about this
legal situation. He felt he had to let each one know, face-to-face, that he would be
charged with a crime and would have to suffer the consequences of his actions.

He now knows he made some bad decisions and we know he is extremely sorry for what he's done.

None of our children have ever been in any kind of trouble with the law or with any kind of authority, and our other two grown children are upset by this situation, knowing the true nature of their brother as they do.

I know you probably hear a lot of parents pleading for leniency on behalf of their sons, but our son has learned a hard, yet valuable, lesson from this situation, and he knows not to repeat this type of action in the future. We hope you can find it in your heart not to incarcerate him, but rather assign him to perform meaningful community service.

Thank you for your time and consideration.

Sincerely,

Larry Corbi, Sr.

Dorothy Corbi

1/6/11

To the Honorable Dale S. Fischer,

My name is Brian Fanale, a business owner who has 13 employees, one of them being Mr. Larry Corbi. I've known Larry for approximately 3 years now, and I hired him about 1 year ago when our company was growing fast and we required some help. I first met Larry through Entrepreneur endeavors and online marketing conventions, and I knew right away Larry was a connector who truly cared about other people.

Your Honor, Larry is one of the most compassionate, strong-willed people I've ever met. His work ethic is unparalleled, which is why we've kept him on staff. He's creative, brings a ton of ideas to the table, is able to connect and build relationships with quality, successful people, and is an extremely likable guy who can attract the right leaders into our business. He helps us with many projects, most of which are customer acquisition and retention, and he knows how to talk to people and take care of them. Since my company hired Larry, I don't believe he's asked for or taken a day off, and is always moving forward.

When Larry hit me and my partners with the news that he would be going to jail, we honestly didn't believe him. He was about in tears when he told us the news because he's got that much passion behind his work. We

could tell immediately that he was disappointed in himself and hurt by the fact that he'd be leaving our team to spend time in jail. I could tell that Larry was very heartfelt and extremely ashamed for what he had done. At the same time it sounded like he was led astray at a young age by an older scam artist. I guess that's what can happen to a young, trusting, optimistic kid when you get him around a dirty scam artist who assures him that everything he's doing is "legal." The guy who led Larry down this path should be the one serving time.

It not only is a bad thing for my company that Larry goes to jail, but in the 3 years I've known him and spent a lot of time with him, I've never even seen him get angry, or even raise his voice at anyone. I've never seen him do any drugs, and I've never seen him abuse alcohol. The guy's one of the rare people in my life that is full of energy, life, and positivity, and he will be sadly missed by both my company and all the people who know him.

All I ask Your Honor is that you hear this letter and I beg that you give Larry the most lenient sentence you legally can because of what I've shared here with you today. We all make mistakes in life, and Larry's taking full responsibility for his. And just so you know, even though he told us that he would be going to jail, he still right now works diligently for our company knowing he'll get his sentencing in April. He has even personally offered to train 1 or 2 other people for no extra pay to fill his position when he leaves us.

That's the type of passionate, committed, ethical person Larry is, and we definitely will not be able to replace his spirit when he's gone.

Please take this letter into consideration during sentencing. Larry's a good kid. I'm glad to have him as one of the core people in a million dollar company that I started from scratch, and I'm even more proud to call Larry my friend. May God be with him and you, Your Honor.

Sincerely,

Brian Fanale

Nick & Shani Gianis

January 3, 2011

The Hon. Dale S. Fischer, U.S. District Judge
United States District Court
255 East Temple Street
Los Angeles, CA 90012

Your Honor:

It is with great sadness that we write this letter to you in support of Larry P. Corbi. My name is Nick Gianis and my wife, Shani, is Larry's first cousin. I have personally known Larry since he was 13 and he is like a younger brother to my wife. He was also one of our groomsmen in our wedding.

Larry grew up in a loving and humble home. He is part of a very large and close family with lots of young cousins. Larry has always displayed a high degree of integrity, responsibility, and ambition. He became a role-model for his younger cousins by excelling in sports at the high school and collegiate level.

After graduating from college he had a deep desire to succeed at the professional level. At a young age he searched for mentors and studied some of America's most successful entrepreneurs. I know him very well and I know he has always wanted to succeed the right way. My wife and I mentored Larry when he was younger and then he became a mentor to us in many ways. When most entrepreneurs focus most of their time and energy on their own success, Larry spends a lot of time trying to help other people succeed. He also spends a lot of time and energy trying to make other people happy too.

Larry is definitely a leader within his family and also with his friends. He has always sacrificed his time for his family. He makes it a point to never miss any significant family events and the family has come to depend on him in so many ways. All of my wife's younger cousins gravitate towards Larry and they never want to let him down. Knowing he is a role model for his younger cousins; he has never done drugs and does not abuse alcohol even though alcoholism is prevalent in his family.

Our three children love being around Larry and can't wait to see him every time we get together. We trust him tremendously and would not hesitate to have him take care of our children if ever needed. My oldest daughter, Alexi, is a sophomore in high school and she will be devastated to not have her big cousin around whenever she needs him to coach her in volleyball or to just hang out and watch a movie. He makes it a point to keep both of my daughters busy and out of trouble and my wife and I greatly appreciate him for this.

Hon. Dale S. Fischer, U.S. District Judge
January 4, 2011
Page 2

He has discussed his mistakes openly with his family and is taking full responsibility for
his actions. I have been very impressed with how he has handled this situation and I
know that he has learned from his mistakes and that he will not put himself in this
position ever again. He informed us recently of his plan to continue to improve himself
during his sentence so he can make a positive difference in the lives of others when he is
able again.

It pains us to think about not having Larry around for an extended period but we
understand and appreciate the difficult position you are in and know that you will be fair
with him. We hope and pray that you consider our letter in your decision regarding his
sentence.

Sincerely,

Nick and Shani Gianis

Nick & Shani Gianis

# GARY ROBINSON

January 9, 2011

The Honorable Dale S. Fisher
United States District Judge
United States District Court
255 East Temple Street
Los Angeles, CA 90012

Your Honor,

This letter concerns the sentencing of Larry Corbi, Jr.

I am not related to Larry, but I've known him for about seven years. I have found him to be an honest person focused on motivating himself and others to achieve their positive best in life.

During the past couple of years, he has become a mentor to my son, who is now sixteen years old. Larry has assisted my son, who was already a fine, courteous boy, in becoming a goal-oriented, community-conscious young man. I am glad my son has gotten to know him, and I appreciate the positive role model Larry has provided. I have come to know Larry's family & I trust him to continue his friendship with my only son having watched their interaction over the years.

I personally believe that both Larry and society would be best served if he were sentenced to perform community service. It would be a shame to remove him from friends, family and associates who've come to know, trust and benefit from his presence. I sincerely believe Larry would never make this same mistake and I have seen that he is truly remorseful.

In any case, I request that you consider the most lenient of sentences for this person who made a terrible mistake.

Thank you,

Gary Robinson

# MICHAEL O. MALONEY

The Hon. Dale S. Fischer,                                          January 24, 2011
United States District Judge
United States District Court
255 East Temple Street
Los Angeles, CA 90012

Re: Larry Corbi, Character Reference Letter

Your Honor,

My name is Michael Maloney and I wish to testify as a character reference for Larry Corbi.

I am the CEO of GoldSilver.com, a precious metals dealer located in Santa Monica, CA, CEO of WealthCycles.com, an educational website, and author of the best selling book on precious metals investing, "Guide to Investing in Gold and Silver."

Larry has been my friend for about 5 years now. Larry first contacted me by telephone in January 2006. We first met at the Learning Annex Wealth Expo, held at the Los Angeles Convention Center in April 2006, where I was speaking along with Robert Kiyosaki and Donald Trump. I was so impressed with Larry that I hired him shortly thereafter. In the three years Larry worked for me, he rose to the head of the sales department within my company.

In the time I have known him he has always demonstrated a high degree of integrity. He fully disclosed this investigation to me when it first began and tendered his resignation, which I did not accept. He did not have to make this investigation known to me or offer his resignation, but did so because he felt it might reflect poorly on my company's image. This level of honesty is a rare thing.

By late 2009 Larry had outgrown his position at my company and left to develop his own business. I was sad to see him go but gave him my blessings.

Again, Larry has never shown me anything but honesty, integrity and loyalty, and I am proud to call him my friend.

I respectfully request that the court show leniency.

Sincerely,

Michael Maloney

January 25, 2011

The Hon. Dale S. Fischer
United States District Court
255 East Temple St.
Los Angeles, CA 90012

RE: Larry Corbi

Your Honor:

I am writing this letter as a character witness in support of Larry Corbi. Currently my wife and I run a youth leadership foundation (The Nothing to Lose Foundation), and have been working as missionaries in the Philippines for the past three years. Larry and I first met in 1993 through a mutual friend while playing in a basketball league in Los Angeles. In 1995 we became fast friends after Larry came to play basketball with me on the Varsity team at La Sierra University. Since that time I have considered him one of my very best friends.

As a friend I would describe Larry as loyal. Larry is known among his peers as a person who will tell you if you are doing something wrong and at the same time be there for you if you are in trouble. These are things that I believe he has learned through his tight knit family. One of the things that I've envied about Larry is the support he has from his family. When you see the Corbi family you see where Larry learned his high values for loyalty and friendship. Another thing that would epitomize Larry is his desire to get better. In recent years I have seen Larry spend an increasing amount of time analyzing his own shortcomings and challenging himself to improve. Whether it was working towards obtaining another degree, seeking out successful mentors, or immersing himself in books, I have watched him embrace education as a tool to progress. Just recently my wife and I were discussing how we admire Larry's passionate pursuit of personal development and his desire to help others find their dreams and experience fuller lives, personally and professionally. It's been a pleasure to watch Larry's commitment to become a better person evolve into a commitment to help others become better as well.

In all the time that I have known him I could never imagine that Larry would do something that would warrant the types of consequences that he is now facing. While I know he will be paying for this crime, I could never think of Larry as a criminal. I do not believe that label is consistent with who he is. I know that Larry has accepted responsibility for his actions and that his character is strong enough to come through this experience a better and stronger person. Larry is a person who actively looks to learn from his mistakes. I have no doubt that he has learned from this and will not find himself in this situation or any other circumstances that would put him in position with breaking the law again.

Over the years Larry's voice has developed into one that inspires his family, friends and associates. I have seen the positive response of those around him to his personal and professional advice. Even through this current legal situation, Larry has never stopped encouraging those around him or helping those that have come to seek him out. Because of this I believe that Larry is an asset of value to his community. Your Honor, it is my hope that you would read this letter and keep in mind my sincere and heartfelt words in your sentencing. I greatly appreciate your time and consideration.

Sincerely,

Jon J. Tulio

# United States Sentencing Commission



## *Statistical Information Packet*

### *Fiscal Year 2009*
### *Central District of California*

EXHIBIT B

**Table 7**

## AVERAGE LENGTH OF IMPRISONMENT BY PRIMARY OFFENSE CATEGORY
## Fiscal Year 2009

| PRIMARY OFFENSE | National Mean Months | National Median Months | National Number | Central California Mean Months | Central California Median Months | Central California Number |
|---|---|---|---|---|---|---|
| **TOTAL** | **54.0** | **30.0** | **70,103** | **47.7** | **36.0** | **1,646** |
| Murder | 274.5 | 270.0 | 93 | 470.0 | 470.0 | 3 |
| Manslaughter | 68.7 | 50.0 | 57 | -- | -- | 2 |
| Kidnapping/Hostage Taking | 212.8 | 168.0 | 41 | -- | -- | 0 |
| Sexual Abuse | 96.0 | 60.0 | 460 | 62.7 | 44.0 | 3 |
| Assault | 43.8 | 30.0 | 554 | 53.5 | 51.0 | 13 |
| Robbery | 82.2 | 63.0 | 981 | 67.1 | 54.0 | 30 |
| Arson | 61.1 | 60.0 | 57 | -- | -- | 1 |
| Drugs - Trafficking | 81.2 | 60.0 | 22,867 | 75.5 | 60.0 | 364 |
| Drugs - Communication Facility | 42.9 | 46.0 | 383 | 34.6 | 30.0 | 46 |
| Drugs - Simple Possession | 8.5 | 2.0 | 355 | 15.9 | 6.0 | 4 |
| Firearms | 91.5 | 60.0 | 7,663 | 59.9 | 57.0 | 81 |
| Burglary/B&E | 26.7 | 24.0 | 31 | -- | -- | 0 |
| Auto Theft | 64.2 | 35.0 | 63 | -- | -- | 0 |
| Larceny | 16.4 | 12.0 | 609 | 18.7 | 17.4 | 11 |
| Fraud | 28.5 | 18.0 | 5,615 | 37.7 | 24.0 | 189 |
| Embezzlement | 16.5 | 12.0 | 216 | 27.3 | 27.0 | 4 |
| Forgery/Counterfeiting | 21.1 | 17.0 | 619 | 25.6 | 16.5 | 28 |
| Bribery | 26.4 | 21.0 | 128 | -- | -- | 2 |
| Tax | 22.4 | 18.0 | 390 | 25.0 | 18.0 | 24 |
| Money Laundering | 41.8 | 24.0 | 621 | 29.2 | 18.0 | 20 |
| Racketeering/Extortion | 102.7 | 60.0 | 580 | 69.9 | 33.0 | 37 |
| Gambling/Lottery | 10.9 | 6.0 | 28 | -- | -- | 0 |
| Civil Rights | 44.7 | 30.0 | 35 | -- | -- | 2 |
| Immigration | 18.9 | 12.0 | 23,757 | 31.2 | 30.0 | 644 |
| Pornography/Prostitution | 121.2 | 78.0 | 1,910 | 77.4 | 60.0 | 83 |
| Prison Offenses | 16.3 | 12.0 | 418 | 23.1 | 21.0 | 16 |
| Administration of Justice Offenses | 23.9 | 15.0 | 600 | 27.0 | 10.0 | 9 |
| Environmental/Wildlife | 12.0 | 10.0 | 60 | -- | -- | 1 |
| National Defense | 53.8 | 34.0 | 58 | 40.0 | 40.0 | 3 |
| Antitrust | 15.2 | 12.0 | 17 | -- | -- | 0 |
| Food & Drug | 14.9 | 10.5 | 14 | -- | -- | 0 |
| Other Miscellaneous Offenses | 18.7 | 10.0 | 823 | 24.2 | 21.0 | 26 |

Of the 81,372 guideline cases, 11,269 cases were excluded for one or more of the following reasons:  zero months prison ordered (10,446), or missing or indeterminable sentencing information (823).

Of the 1,937 guideline cases from the Central District of California, 291 cases were excluded due to one of the following reasons:  zero prison months ordered (284) or missing or indeterminable sentencing information (7).

SOURCE:  U.S. Sentencing Commission, 2009 Datafile, OPAFY09.

**Table 10**

## GUIDELINE DEPARTURE RATE BY PRIMARY OFFENSE CATEGORY
### Fiscal Year 2009

**National**

| PRIMARY OFFENSE | TOTAL | WITHIN GUIDELINE RANGE | | ABOVE RANGE DEPARTURE | | ABOVE RANGE DEPARTURE W/*BOOKER* | | ABOVE RANGE W/BOOKER | | REMAINING ABOVE RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **79,153** | **44,991** | **56.8** | **382** | **0.5** | **151** | **0.2** | **842** | **1.1** | **121** | **0.2** |
| **Robbery** | **1,006** | 598 | 59.4 | 14 | 1.4 | 3 | 0.3 | 26 | 2.6 | 3 | 0.3 |
| **Drugs - Trafficking** | **23,899** | 11,087 | 46.4 | 56 | 0.2 | 15 | 0.1 | 93 | 0.4 | 24 | 0.1 |
| **Drugs - Simple Possession** | **530** | 477 | 90.0 | 3 | 0.6 | 1 | 0.2 | 13 | 2.5 | 3 | 0.6 |
| **Firearms** | **8,225** | 5,064 | 61.6 | 76 | 0.9 | 38 | 0.5 | 135 | 1.6 | 22 | 0.3 |
| **Larceny** | **1,510** | 1,128 | 74.7 | 6 | 0.4 | 2 | 0.1 | 10 | 0.7 | 5 | 0.3 |
| **Fraud** | **7,016** | 4,107 | 58.5 | 39 | 0.6 | 15 | 0.2 | 109 | 1.6 | 14 | 0.2 |
| **Embezzlement** | **466** | 316 | 67.8 | 0 | 0.0 | 1 | 0.2 | 4 | 0.9 | 0 | 0.0 |
| **Forgery/Counterfeiting** | **882** | 600 | 68.0 | 8 | 0.9 | 2 | 0.2 | 13 | 1.5 | 5 | 0.6 |
| **Immigration** | **25,385** | 15,860 | 62.5 | 106 | 0.4 | 37 | 0.1 | 278 | 1.1 | 26 | 0.1 |
| **Other Miscellaneous Offenses** | **10,234** | 5,754 | 56.2 | 74 | 0.7 | 37 | 0.4 | 161 | 1.6 | 19 | 0.2 |

**Central California**

| PRIMARY OFFENSE | TOTAL | WITHIN GUIDELINE RANGE | | ABOVE RANGE DEPARTURE | | ABOVE RANGE DEPARTURE W/*BOOKER* | | ABOVE RANGE W/BOOKER | | REMAINING ABOVE RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **1,920** | **620** | **32.3** | **8** | **0.4** | **8** | **0.4** | **19** | **1.0** | **6** | **0.3** |
| **Robbery** | **30** | 13 | 43.3 | 0 | 0.0 | 0 | 0.0 | 1 | 3.3 | 1 | 3.3 |
| **Drugs - Trafficking** | **381** | 130 | 34.1 | 2 | 0.5 | 1 | 0.3 | 3 | 0.8 | 0 | 0.0 |
| **Drugs - Simple Possession** | **8** | 5 | 62.5 | 1 | 12.5 | 0 | 0.0 | 0 | 0.0 | 1 | 12.5 |
| **Firearms** | **86** | 47 | 54.7 | 1 | 1.2 | 1 | 1.2 | 2 | 2.3 | 0 | 0.0 |
| **Larceny** | **30** | 14 | 46.7 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Fraud** | **283** | 134 | 47.3 | 0 | 0.0 | 2 | 0.7 | 2 | 0.7 | 0 | 0.0 |
| **Embezzlement** | **12** | 6 | 50.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Forgery/Counterfeiting** | **39** | 22 | 56.4 | 0 | 0.0 | 1 | 2.6 | 0 | 0.0 | 1 | 2.6 |
| **Immigration** | **662** | 108 | 16.3 | 0 | 0.0 | 0 | 0.0 | 5 | 0.8 | 2 | 0.3 |
| **Other Miscellaneous Offenses** | **389** | 141 | 36.2 | 4 | 1.0 | 3 | 0.8 | 6 | 1.5 | 1 | 0.3 |

## National

| PRIMARY OFFENSE | §5K1.1 SUBSTANTIAL ASSISTANCE | | §5K3.1 EARLY DISPOSITION | | OTHER GOV'T SPONSORED | | BELOW RANGE DEPARTURE | | BELOW RANGE DEPARTURE W/*BOOKER* | | BELOW RANGE W/*BOOKER* | | REMAINING BELOW RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **9,855** | **12.5** | **7,242** | **9.1** | **2,914** | **3.7** | **1,542** | **1.9** | **861** | **1.1** | **9,358** | **11.8** | **894** | **1.1** |
| **Robbery** | 113 | 11.2 | 1 | 0.1 | 34 | 3.4 | 24 | 2.4 | 26 | 2.6 | 159 | 15.8 | 5 | 0.5 |
| **Drugs - Trafficking** | 6,192 | 25.9 | 1,438 | 6.0 | 867 | 3.6 | 409 | 1.7 | 297 | 1.2 | 3,223 | 13.5 | 198 | 0.8 |
| **Drugs - Simple Possession** | 10 | 1.9 | 0 | 0.0 | 4 | 0.8 | 5 | 0.9 | 0 | 0.0 | 9 | 1.7 | 5 | 0.9 |
| **Firearms** | 955 | 11.6 | 17 | 0.2 | 299 | 3.6 | 155 | 1.9 | 101 | 1.2 | 1,272 | 15.5 | 91 | 1.1 |
| **Larceny** | 88 | 5.8 | 1 | 0.1 | 35 | 2.3 | 19 | 1.3 | 15 | 1.0 | 165 | 10.9 | 36 | 2.4 |
| **Fraud** | 1,050 | 15.0 | 8 | 0.1 | 231 | 3.3 | 107 | 1.5 | 92 | 1.3 | 1,118 | 15.9 | 126 | 1.8 |
| **Embezzlement** | 14 | 3.0 | 0 | 0.0 | 11 | 2.4 | 9 | 1.9 | 10 | 2.1 | 88 | 18.9 | 13 | 2.8 |
| **Forgery/Counterfeiting** | 101 | 11.5 | 1 | 0.1 | 15 | 1.7 | 9 | 1.0 | 11 | 1.2 | 105 | 11.9 | 12 | 1.4 |
| **Immigration** | 317 | 1.2 | 5,753 | 22.7 | 713 | 2.8 | 591 | 2.3 | 126 | 0.5 | 1,336 | 5.3 | 242 | 1.0 |
| **Other Miscellaneous Offenses** | 1,015 | 9.9 | 23 | 0.2 | 705 | 6.9 | 214 | 2.1 | 183 | 1.8 | 1,883 | 18.4 | 166 | 1.6 |

## Central California

| PRIMARY OFFENSE | §5K1.1 SUBSTANTIAL ASSISTANCE | | §5K3.1 EARLY DISPOSITION | | OTHER GOV'T SPONSORED | | BELOW RANGE DEPARTURE | | BELOW RANGE DEPARTURE W/*BOOKER* | | BELOW RANGE W/*BOOKER* | | REMAINING BELOW RANGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **215** | **11.2** | **477** | **24.8** | **122** | **6.4** | **62** | **3.2** | **43** | **2.2** | **267** | **13.9** | **73** | **3.8** |
| **Robbery** | 1 | 3.3 | 0 | 0.0 | 4 | 13.3 | 0 | 0.0 | 2 | 6.7 | 7 | 23.3 | 1 | 3.3 |
| **Drugs - Trafficking** | 86 | 22.6 | 0 | 0.0 | 42 | 11.0 | 19 | 5.0 | 17 | 4.5 | 71 | 18.6 | 10 | 2.6 |
| **Drugs - Simple Possession** | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 1 | 12.5 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **Firearms** | 5 | 5.8 | 0 | 0.0 | 4 | 4.7 | 6 | 7.0 | 0 | 0.0 | 17 | 19.8 | 3 | 3.5 |
| **Larceny** | 0 | 0.0 | 0 | 0.0 | 3 | 10.0 | 1 | 3.3 | 3 | 10.0 | 1 | 3.3 | 8 | 26.7 |
| **Fraud** | 62 | 21.9 | 1 | 0.4 | 19 | 6.7 | 12 | 4.2 | 2 | 0.7 | 38 | 13.4 | 11 | 3.9 |
| **Embezzlement** | 0 | 0.0 | 0 | 0.0 | 1 | 8.3 | 1 | 8.3 | 0 | 0.0 | 2 | 16.7 | 2 | 16.7 |
| **Forgery/Counterfeiting** | 5 | 12.8 | 0 | 0.0 | 1 | 2.6 | 0 | 0.0 | 1 | 2.6 | 6 | 15.4 | 2 | 5.1 |
| **Immigration** | 12 | 1.8 | 476 | 71.9 | 12 | 1.8 | 5 | 0.8 | 8 | 1.2 | 27 | 4.1 | 7 | 1.1 |
| **Other Miscellaneous Offenses** | 44 | 11.3 | 0 | 0.0 | 36 | 9.3 | 17 | 4.4 | 10 | 2.6 | 98 | 25.2 | 29 | 7.5 |

Of the 81,372 guideline cases, 2,219 cases were excluded due to missing information from the submitted documents that prevented the comparison of the sentence and the guideline range.

Of the 1,937 guideline cases from the Central District of California, 17 cases were excluded due to missing information needed to determine the relationship between the sentence imposed and the guideline range.

SOURCE:  U.S. Sentencing Commission, 2009 Datafile, OPAFY09.

19

## **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2115 Main Street, Santa Monica, California 90405.

On May 2, 2011, I served the foregoing document described as DEFENSE POSITION REGARDING SENTENCING, AND OBJECTIONS TO PRESENTENCE REPORT; EXHIBITS on each interested party, as follows:

Elizabeth Morony, USPO
U.S. Probation Office
312 North Spring Street
6th Floor
Los Angeles, CA  90012-4708

Elizabeth_Morony@cacp.uscourts.gov

☒        (BY ELECTRONIC MAIL)  I caused the foregoing document to be served electronically by electronically mailing a true and correct copy through Evan A. Jenness' electronic mail system to the e-mail address(es), as set forth above, and the transmission was reported as complete and no error was reported.

Executed on May 2, 2011, at Santa Monica, California.

I declare under penalty of perjury that the foregoing is true and correct.


_____          _____
    Dawn F. Mancil
    (Type or print name)                              (Signature)